**Mark G. EPSTEIN, on his own behalf and on behalf of all others similarly situated, Plaintiff,**

v.

**ITRON, INC., and Johnny M. Humphreys, Defendants.**

**No. CS–97–214–RHW.**

United States District Court, E.D. Washington.

Jan. 22, 1998.

John Randall Layman, Spokane, WA, Carl A. Taylor Lopez, Seattle, WA, Steven J. Toll and Matthew James Ide, Seattle, WA, Joseph J. Tobacco, Jr., San Francisco, CA, for Plaintiff.

Barry M. Kaplan, Seattle, WA, for Defendant.

## ORDER DENYING MOTION TO DISMISS

WHALEY, District Judge.

Before the Court is Defendants' Motion to Dismiss (Ct.Rec.17). A hearing was held on Defendants' motion on October 27, 1997. Joseph Tabacco, Matthew Ide, and John Layman appeared on behalf of Plaintiff. Barry Kaplan appeared on behalf of Defendants.

Defendants contend that Plaintiff's Complaint, which alleges violations of the Securities Exchange Act of 1934, fails to state a claim on which relief can be granted. Specifically, Defendants argue Plaintiff has failed to comply with the heightened pleading stan-

dard that was enacted as part of the Private Securities Litigation Reform Act of 1995. As is discussed more fully below, this order denies Defendants' motion because Plaintiff has alleged with particularity sufficient facts to create a strong inference that, at a minimum, Defendants recklessly issued materially misleading statements.

## I. SUMMARY OF FACTS

The following summary is drawn from Plaintiff's Complaint, the factual allegations of which must be accepted as true for purposes of this motion.

Defendants are Itron, Inc. ("Itron"), a Washington corporation, and Johnny M. Humphreys ("Humphreys"), Itron's president, chief executive officer ("CEO"), and director since 1987. Humphreys also owns more than 260,000 shares of Itron's stock, which is publicly traded on the NASDAQ market. Plaintiff is Mark G. Epstein ("Plaintiff"), owner of 100 shares of Itron's stock.

Itron develops and sells systems that automatically collect data from utility meters ("AMR systems"). These systems are designed to reduce the costs associated with collecting data from utility meters located at or near the utility customers' sites, which for the most part are residences spread throughout large urban and rural areas.

Itron's AMR systems are based on Itron's Enco der/Receiver/Transmitter ("ERT") modules. ERTs are installed on utility meters and use high-frequency radio signals to transmit meter data to nearby receivers. Itron's ERTs transmit their signals to one of three types of receivers: hand-held receivers ("OMR"), receivers mounted in vehicles ("Mobile AMR"), and networks of fixed receivers ("Fixed Network AMR"). In the Fixed Network AMR, receivers placed in fixed locations retrieve data from the ERTs in the receivers' area and forward the information to the utility or another entity that provides meter reading services. Because of utility industry demand for the enhanced meter reading economies and functions that a fixed network allows, development of a viable fixed network system is essential to the survival of companies that provide AMR systems.

Plaintiff alleges that Itron's ERTs have two unalterable characteristics that make them a technologically infeasible basis for a fixed network AMR system. First, ERTs transmit at an extremely low power point because of inherent limitations in the batteries that power them and related system longevity concerns. While this power point is sufficient to support reliable OMR and Mobile AMR systems, it is too low to broadcast data as frequently or reliably as is necessary in a fixed network environment. Second, ERTs send data only after being awakened by a radio signal sent by a receiver, a practice known as "polling." This practice is incompatible with a fixed network environment because polling causes multiple ERTs to respond simultaneously to each wake-up signal, thereby causing interference among data transmissions and loss of data.

Plaintiff also alleges that Itron and Humphreys have known since at least 1993 that a Fixed Network AMR based on ERTs was not technologically feasible. In support of this conclusion, Plaintiff asserts it is reasonable to infer that Itron and its key officers would be aware of the technological capabilities of their core products. Plaintiff also points to a 1993 marketing brochure that was distributed by Itron to select customers in an effort to promote its Mobile AMR system. That brochure discussed in detail the technological difficulties associated with reading ERTs and concluded:

> After considering all the things that affect readability, you can see it is not possible to simply stick a stationary receiving antenna up in the air and expect to read all meters within a range of a half-mile, one-tenth of a mile, or any other distance, for that matter.
>
> But experience has shown that when procedures are used that take into consideration the factors that affect meter readability, it is possible to establish a reliable, economical [mobile] procedure with which to read all meters in an area.

Attachment to Defendants' Reply Brief at 3. Plaintiff also points to a Form 10–K filed by Itron with the Securities and Exchange Commission ("SEC") in March, 1997. In that Form 10–K, Itron discussed its fiscal

year ending on December 31, 1996 and acknowledged that it had experienced delays in meeting the performance milestones set in a January 1996 contract that called for the installation of a Fixed Network AMR system on behalf of Duquesne Light Company. Specifically, the Form 10–K stated:

The Company has experienced delays in performing its obligations under the Duquesne Contract. These delays relate primarily to the development of certain advanced meter reading functions and the software needed to complete these functions....

Complaint at 32.

Humphreys and other Itron officers made a number of public statements between September 11, 1995 and October 22, 1996 ("the class period").[1] These statements concerned a variety of matters relevant to Itron's success in implementing its Fixed Network AMR system, including: 1) the performance and capabilities of Itron's Fixed Network ARM system and equipment; 2) the capabilities of Itron's ERT modules; 3) the ERT modules' ability to integrate into a fixed network; 4) the status of Itron's performance under major customer contracts; and 5) the customer levels of satisfaction and dissatisfaction with Itron's products, services and capabilities. Each of these statements was either false or materially misleading, Plaintiff alleges, because the statements failed to divulge the seriousness of the technological problems Itron was experiencing in attempting to create a fixed network system based on ERTs. Itron made these statements, according to Plaintiff, because it realized that

1. The issue of whether this action should be certified as a class action has not been decided.

2. Section 10(b) of the 1934 Act states in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce ...
  \*   \*   \*   \*   \*   \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 further provides:

its continued economic success depended on its ability to convince its current and potential customers that it would be able to successfully incorporate its core product into the emerging fixed network environment. In essence, Plaintiff alleges Defendants made these statements in an effort to buy time while it searched for a technological "fix" for the problems described in the 1993 marketing brochure. During this same period, Itron's common stock dropped from $60 to $15 per share.

Based on the foregoing allegations, *inter alia,* Plaintiff's Complaint contends that Itron and Humphrey's have violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), as well as SEC Rule 10b–5.[2]

## II. DISCUSSION

Defendants contend that Plaintiff's Complaint should be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) because it does not satisfy the heightened pleading standard for securities fraud claims that was enacted as part of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 743 (1995). Specifically, Defendants allege the Complaint fails to satisfy the requirement that it state "with particularity" facts that give rise to a "strong inference" that they made the alleged false and misleading statements with the type of state of mind required for a valid securities fraud claim. *See id.* at § 21(D)(b)(2) (codified at 15 U.S.C. § 78u–4(b)(2)). *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375,

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. Section 20(a) of the 1934 Act provides for joint and several liability for persons who directly or indirectly control persons who violate relevant securities laws, including § 10(b) and Rule 10b–5. 15 U.S.C. § 78t(a).

47 L.Ed.2d 668 (1976) (scienter is a required element of § 10(b) and Rule 10b–5 claims). The parties agree this requirement applies to Plaintiff's causes of action and that Plaintiff's Complaint otherwise states a claim on which relief may be granted.[3]

## A. THE PSLRA'S PLEADING STANDARD

■ Plaintiff's Complaint is reviewed under a more stringent standard of review than is usually applied to Fed.R.Civ.P. 12(b)(6) motions to dismiss. Normally, a complaint may be dismissed for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996) (same). This liberal approach to alleging facts sufficient to state a claim is replaced by more stringent requirements when, as here, the basis for the motion to dismiss is a challenge to the sufficiency of a complaint's allegations relevant to the state of mind element of a securities fraud claim for monetary damages. Under the controlling standard enacted by the PSLRA,

> the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). If a plaintiff fails to comply with this provision, the complaint must be dismissed. *Id.* § 78u–4(b)(3).

■ On its face, § 78u–4(b)(2) imposes two additional pleading requirements for securities fraud claims: 1) pleading "with particularity;" and 2) pleading a sufficient quantum of facts (*i.e.,* enough to give rise to a "strong" inference) relating to the state of mind requirement relevant to the securities fraud claims alleged. Each of these requirements "heightens" the post-PSLRA pleading requirement for securities fraud claims because they require plaintiffs to plead more than was required under pre-PSLRA law in most federal circuits. *See, e.g., In re GlenFed Inc.*

*Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994) (en banc) (rejecting Second Circuit's pleading with particularity and "strong inference" requirements). As with other types of Rule 12(b)(6) motions, however, the Complaint's allegations of material fact must be taken as true and construed in the light most favorable to Plaintiff. *Smith,* 84 F.3d at 1217. The issue is not whether Plaintiff will ultimately prevail, but whether he is entitled to offer evidence in support of his claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ Thus, in addressing a motion to dismiss for failure to meet this standard, a court must resolve three interrelated questions. First, the court must determine whether the complaint pleads with particularity facts relevant to scienter. Second, the court must determine whether the facts pleaded with particularity are sufficient to give rise to a strong inference of scienter. Finally, the court ·must determine whether the type of state of mind that could be strongly inferred from the facts pleaded in the complaint is sufficient to state a securities fraud claim. If the allegations of the complaint cannot support an affirmative answer to each of these questions, then the complaint fails to state a claim on which relief can be granted.

Each of these questions is addressed below, beginning with the question of the nature of the state of mind requirement in a § 10(b) securities fraud claim.

### 1. State of Mind

■ First addressed is Defendants' contention that the PSLRA established a uniform state of mind requirement for § 10(b) securities fraud claims. Having considered the parties' extensive submissions and arguments on this point, the Court agrees with Plaintiff that the PSLRA does not address the question of what type of state of mind is sufficient to support a securities fraud claim. Thus, the state of mind requirement that governs this action is the same requirement

---

**3.** Thus, the parties do not dispute that 1) the allegations contained in Plaintiff's Complaint satisfy the additional pleading requirements imposed by 15 U.S.C. § 78u–4(b)(1) (requiring pleading with particularity as to allegedly false

or misleading statements); 2) those statements were materially false or misleading if Plaintiff's allegations are true; or 3) the Complaint adequately alleges facts relevant to all other required elements of a § 10(b) claim.

that existed in the Ninth Circuit prior to the PSLRA's enactment: whether statements are made with actual knowledge or reckless disregard of their materially false or misleading nature. *See, e.g., In re Software Toolworks* 50 F.3d 615, 626 (9th Cir.1994). Because the various federal district courts that have reached the question of whether the PSLRA establishes a uniform state of mind requirement are in disagreement on this issue, including district courts within the Ninth Circuit, the discussion below elaborates the underlying reasons for this conclusion.

Whether Congress adopted a specific state of mind requirement in the PSLRA is question of legislative intent. The best indicator of that intent is the actual language approved by the requisite majority of the members of Congress. *See, e.g., Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("where [Congress'] will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive"). Here, Congress stated only that plaintiffs must plead sufficient facts to raise a strong inference of the "required state of mind." Nothing in the language of this ambiguous formulation describes what that state of mind must be or otherwise indicates that Congress intended to adopt a specific state of mind.

Nor is there any indication elsewhere in the PSLRA's language that Congress intended to impose a uniform state of mind requirement on all § 10(b) claims. Had Congress intended to impose such a requirement, it clearly knew how to do so. In the section of the act that creates a "safe harbor" for forward-looking statements, for example, Congress heightened the scienter element for such statements to require "actual knowledge" of their falsity or misleading nature.[4] 15 U.S.C. § 78u–5(c)(1)(B). *See also* 15 U.S.C. § 78u–4(g)(2)(A) (limiting joint and several liability to covered persons who "knowingly committed" a securities law violation); *id.* § 78u–4(g)(10)(B) ("reckless conduct" is not sufficient to establish a "knowing" violation of securities laws for purposes of joint and several liability). The natural implication of Congress's failure to expressly

impose a similar state of mind requirement on § 10(b) securities fraud claims is that it did not adopt a uniform state of mind requirement for such claims. *Cf. Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 2063–68, 138 L.Ed.2d 481 (1997). This implication is strengthened by the steps Congress took to limit the scope of its imposition of specific state of mind requirements in the sections where Congress reached this question. *See, e.g.,* 15 U.S.C. § 78u–4(g)(1) (nothing in subsection limiting joint and several liability to "knowing" securities law violations "shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws").

Moreover, Congress did not legislate in a vacuum. When Congress enacted the PSLRA, a substantial body of case-law existed that detailed the scienter element of a securities fraud claim. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (simple negligence fails to state a claim, but recklessness may be sufficient); *Software Toolworks,* 50 F.3d at 626 ("plaintiffs may establish scienter by proving either actual knowledge or recklessness"). When Congress reenacts or modifies an existing statute, it is presumed to be aware of existing judicial interpretations of that statute. *Lorillard, Div. of Loew's Theatres, Inc. v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Given this presumption and the patent ambiguity of the language Congress enacted, a uniform state of mind requirement is not expressly or implicitly evident in the text of § 78u–4(b)(2).

Unaided by the text of the statute, Defendants rely on selective portions of the PSLRA's legislative history in an effort to read a uniform state of mind requirement into § 78u–4(b)(2). Defendants note, for example, that the Conference Committee rejected an amendment proposed by Senator Specter that would have codified case law from the Second Circuit because the Committee wished to make it clear that it "in-

---

4. Defendants have not argued that any of the statements at issue constitute forward-looking

statements that are governed by this provision.

tended to strengthen existing pleading requirements." Joint Explanatory Statement of the Committee of Conference, H.R.Conf. Rep. No. 104–369 at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 737 (hereafter "Statement of Managers").[5] Defendants also point to various statements of congressional supporters of the PSLRA and President Clinton's veto message, which they interpret as indicating Congress intended to create a uniform, heightened pleading requirement.

These slender threads cannot bear the weight of Defendants' argument. While persuasive, the Statement of Managers report is not a conclusive indicator of Congress's intent because only a small minority of the members of Congress participated in the Conference Committee, and even fewer helped draft its report. Additionally, the portion of this report upon which Defendants rely focuses almost entirely on the pleading with particularity and strong inference requirements, with no discussion of an intent to create a uniform state of mind requirement.[6] *Id.* Moreover, where the Statement of Managers directly addresses the state of mind element, it does so in a manner that suggests the Committee did not intend for Congress to alter the existing status quo. For example, the Statement of Managers explained that in creating a "fair share" liability rule for "non-knowing" violations of the 1934 Act,

> the Conference Committee explicitly determined that the legislation should make no change to the state of mind requirements of existing law. Accordingly, ... Section 201 of the Conference Report makes clear that the "fair share" rule of proportionate liability does not create any new cause of action or expand, diminish, or otherwise affect the substantive standard for liability in any action under the 1933 Act or the 1934 Act.

*See id.* at 38; *see also* 15 U.S.C. § 78u–4(g) (codifying "Section 201" of the PSLRA).

**5.** The full text of Senator Specter's proposed amendment can be found at 141 Cong.Rec. S9150, S9170–71 (1995).

**6.** The Conference Committee's Statement of Managers does mention "fraudulent intent" in the key section on which Defendants rely. This reference is not persuasive evidence that Congress intended to impose a uniform state of mind

The strongest suggestion that the Committee reached the issue of scienter is a single footnote buried at the end of the report that suggests the Committee rejected Senator Specter's codification amendment because the Committee "chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." *Id.* at 48 n. 23. Even if this ambiguous reference to the state of mind element reflected the intent of Congress, the most that could be said is that Congress rejected efforts to codify recklessness as a sufficient state of mind. Because neither the Committee nor the Congress as a whole took the critical next step of affirmatively codifying a state of mind standard, this language does not evince a congressional intent to impose a uniform state of mind requirement.

Equally unpersuasive is Defendants' reliance on the President's veto message and the congressional debate following that veto. President Clinton's veto message provides little indication of *congressional* intent given the fact that it was overridden following a debate in which many members of Congress contended the President had mistaken their intent. *See, e.g.,* 141 Cong.Rec. S19060–02, S19066–68 (comments of Senator Dodd, supporter and sponsor of PSLRA). Moreover, the President's statement is patently ambiguous. In his statement, the President addressed the pleading requirements imposed by the proposed legislation in the following manner.

> Specifically, I object to the following elements of this bill. First, I believe that the pleading requirements of the Conference Report with regard to defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the standards of the Second Circuit, but I am not prepared to go beyond that.

requirement of actual knowledge or intent for many of the same reasons outlined above. Additionally, at the time the PSLRA was enacted, most circuits had concluded that "intent to defraud" could encompass recklessness. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir.1990) (en banc); *see also Ernst,* 425 U.S. at 194 n. 12 (expressly leaving this question open).

*See* 141 Cong.Rec. S19037–02, 19048 (1995) (reprinting entire text of veto message). Nowhere in this statement, nor elsewhere in the message, does the President indicate that he understood the term "pleading requirement" to refer to a heightened state of mind requirement rather than to a more stringent means of inferring state of mind. Additionally, the relevant portions of the congressional debate that preceded Congress's override of the President's veto actually work against Defendants' argument because they focused almost entirely on the pleading with particularity and strong inference requirements rather than on scienter. *See, e.g.,* 141 Cong. Rec. S19060–02, S19066–68 (Senator Dodd). While some statements made during this debate suggest the Conference Committee rejected Senator Specter's amendment in part because of its reference to recklessness, *see, e.g., id.* at 19071 (Senator Dodd, describing Senator Specter's amendment as "an effort to get recklessness in, which would have changed the standard from the second circuit"), no clear collective voice emerges from this debate that can fairly be construed as indicating Congress intended to take the additional step of affirmatively incorporating a uniform state of mind requirement into the PSLRA's pleading standard.

In sum, while some members of Congress may have wished to impose a uniform, heightened state of mind requirement on securities fraud claims, the fact that such a change is absent from the language of the statute is compelling evidence they were not able to achieve this goal. Nothing in the legislative history dictates a contrary conclusion. In fact, as at least one commentator has concluded, the legislative history leaves the strong impression that Congress "studiously ... avoided" deciding the issue of what particular state of mind must be strongly inferred under § 78u–4(b)(2). John W. Avery, Securities Litigation Reform: The Long and Winding Road to the Private Securities Litigation Reform Act of 1995, 51 Bus. Law 335, 337 (1996). Thus, the PSLRA did not alter landscape of the law as it applies to the question of scienter in § 10(b) claims and the state of mind requirement relevant to

Plaintiff's Complaint remains the same as it was prior to the PSLRA's passage.

▊ To prove scienter under controlling Ninth Circuit precedents, a plaintiff must allege facts that go directly or circumstantially to whether "defendants had a mental state embracing an intent to deceive, manipulate or defraud." *Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996). More specifically, Plaintiff must demonstrate Defendants had actual knowledge of the falsity or misleading nature of their statements or material omissions, or that they were made recklessly. *Id; see also Gray v. First Winthrop Corp.,* 82 F.3d 877, 884 (9th Cir.1996) (to meet scienter requirement, plaintiffs must show either knowing or reckless conduct on the part of defendants).[7] This latter standard—recklessness—requires:

> not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Provenz,* 102 F.3d at 1490. In other words, at a minimum, Plaintiff's direct and circumstantial evidence relevant to scienter must be sufficient to create a strong inference that the danger of misrepresentation made Defendants' conduct "highly unreasonable" and an "extreme departure from standards of ordinary care." *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc).

### 2. Particularity

▊ Unlike the state of mind requirement for § 10(b) claims, the PSLRA indisputably heightened the level of specificity with which a plaintiff must plead facts relevant to a defendant's state of mind. Prior to the PSLRA's enactment, the federal circuits were split on this question. *Compare Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (section 10b requires a complaint be "plead with particularity the facts and circumstances constituting the fraud itself") *with In*

---

**7.** *Provenz* and *Gray* were both filed before the PSLRA's December 22, 1995 effective date and, thus, are governed by the Ninth Circuit's pre-

PSLRA pleading standard. *Cooper v. Pickett,* 122 F.3d 1186, 1197 & n. 2 (9th Cir.1997).

*re GlenFed Inc. Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994) (en banc) (state of mind requirement of § 10(b)'s claims could be averred generally); *see also* Fed.R.Civ.P. 9(b). In clear and express language, the PSLRA resolved this split in favor of requiring that plaintiffs "state with particularity" facts going to the state of mind requirement of securities fraud claims seeking monetary damages. The parties do not contest this point, and Plaintiff concedes that he must plead with particularity facts sufficient to satisfy § 10(b)'s state of mind requirement.

Defendants acknowledge that Plaintiff has met this requirement as to at least two of the allegations in his Complaint: the 1993 brochure and the 1997 SEC form. Plaintiff also contends that his allegations regarding the fundamental technological flaws in Itron's Fixed Network AMR system constitute circumstantial evidence of Defendants' state of mind at the time the challenged statements were made. While the parties dispute this point, that dispute goes to the weight the Court should give these statements, not to whether they satisfy § 78u–4(b)(2)'s pleading with particularity standard.

Accordingly, the Court finds that Plaintiff has met his pleading with particularity burden. Thus, the Court is left only with the question of whether Plaintiff's factual allegations are sufficient to give rise to a strong inference that Defendants made the challenged statements recklessly or with actual knowledge that they were materially false or misleading.

### 3. Strong Inference of State of Mind

Before reaching the sufficiency of Plaintiff's factual allegations, an additional detour is necessary to address a legal question disputed by the parties. That question deals with what Congress intended when it required that the inference as to a defendant's state of mind be "strong."[8] As yet, this question has not been addressed by either the United States Court of Appeals for the Ninth Circuit or the United States Supreme Court.

One possibility, favored by Plaintiff, is that Congress did not alter the quantum of proof aspect of scienter pleading. In other words, all Plaintiff need do is plead sufficient facts giving rise to a simple inference of actual knowledge or recklessness. Such an interpretation, however, renders Congress's use of the adjective "strong" mere surplusage, ignoring the well-established dictate that "[i]n construing a statute [courts] are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Such an interpretation also is inconsistent with the PSLRA's legislative history, which the parties concede indicates Congress intended to heighten the pleading standard for scienter to deter frivolous securities litigation suits. *See, e.g.,* Statement of Managers at 41 (referring to need to "establish more uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits."). While the PSLRA's legislative history is ambiguous on the question of whether Congress attempted to meet this goal by imposing a heightened state of mind requirement, it unambiguously indicates Congress intended to heighten both the level of specificity with which facts relating to scienter must be pleaded and the quantum of the inference necessary as to defendants' unlawful state of mind. *See, e.g., id.:*

> The Conference Committee language is based in part on the pleading standard of the Second Circuit .... the Second Circuit requirement is that the plaintiff state facts with particularity, *and* that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent.

Thus, the plain language of § 78u–4(b)(2) and its legislative history strongly support the view that Congress intended to require plaintiffs to allege facts sufficient to allow more

---

8. Neither party contends that Congress altered the prior state of the law as to what type of evidence—direct or circumstantial—could be relied upon to state a claim. The recognized difficulty of acquiring direct evidence of state of mind and Congress's choice of the term "inference," which necessarily implies conclusions drawn from circumstantial evidence, constitute strong evidence that Congress left untouched preexisting law that allowed plaintiffs to rely on both direct and circumstantial evidence of scienter. *See, e.g., In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424–1425 (9th Cir.1994).

than a mere inference of scienter to be drawn.[9]

The question, then, is what is the distinction between an inference that is strong, and one that is not? The courts that have addressed this question to date are in agreement that Congress borrowed this language from the Second Circuit, which has long required that plaintiffs plead sufficient facts to create a "strong" inference of scienter. *See e.g. Ross v. A.H. Robins Co. Inc.*, 607 F.2d 545 (2d Cir.1979). In the Second Circuit, a plaintiff may satisfy this standard in one of the following ways:

> either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

It is not clear, however, whether Congress intended to adopt this two prong approach to pleading a strong inference of scienter. More specifically, the PSLRA's legislative history indicates that at least some members of Congress did not intend to codify the motive and opportunity approach to creating a strong inference of scienter. The Statement of Managers, for example, explained that:

> Because the Conference Committee intends to strengthen existing leading, requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard. For this reason the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

Statement of Managers at 41 & n. 23 (combining statement text with footnote text). Relying on this and other evidence relevant to Congress's intent, courts have reached various conclusions on the question of whether Congress adopted the Second Circuit's motive and opportunity approach to determining whether a "strong inference" of scienter exists. *Compare Marksman Partners v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1310 (C.D.Cal.1996) (PSLRA standard incorporates motive and opportunity test) *with In re Silicon Graphics, Inc. Secur. Litig.*, 970 F.Supp. 746, 757 (N.D.Cal.1997) (by itself, satisfaction of Second Circuit's motive and opportunity test is not sufficient to create strong inference of scienter).[10]

It is unnecessary to reach this disputed issue here because Plaintiff's factual allegations are not sufficient to meet the

---

**9.** This puts securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial, where a simple inference of scienter is sufficient to support a jury's verdict. One potential explanation for this seeming disparity is that the two positions are irreconcilable and, thus, Congress's use of the adjective "strong" should be ignored because it works an irrational result. There are alternative explanations, however, that do not require courts to ignore both § 78u–4(b)(2)'s plain language and the legislative history indicating that this provision was intended to make it more difficult for plaintiffs to file meritless claims. One such explanation is that Congress deemed it appropriate to create a heightened pleading burden without also creating a heightened substantive burden because of the shifting evidentiary presumptions that apply during the various stages of litigation. In other words, Congress may have deemed it appropriate to impose a higher pleading standard because a court must presume a plaintiff's factual allegations to be true at the pleading stage, but inappropriate at successive stages of the litigation because this presumption falls away until the

point where, at trial, plaintiffs bear the burden of proving each element of their case by a preponderance of the evidence. Given the existence of alternative explanations such as this, it is unnecessary to reject the plain language of § 78u–4(b)(2) as working an irrational result in the larger context of securities fraud litigation.

**10.** In at least one decision, the United States Court of Appeals for the Ninth Circuit has employed a motive and opportunity approach to proving scienter. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 931 (9th Cir.1993). Because this opinion applied pre-PSLRA law and did not purport to be determining whether or not the plaintiff's inference was "strong," that decision provides little insight on the matters addressed today. Moreover, the compensation of the defendants in that case was apparently linked to the price of their company's stock, an allegation that is absent from this case. *Id.; see also Shields*, 25 F.3d at 1130 (motives of protecting executive position and increasing stock price-related compensation are insufficient to demonstrate motive).

motive component of the Second Circuit's motive and opportunity test even if Congress adopted this approach to pleading scienter. Under the Second Circuit's standard, a showing of motive requires more than the mere potential that financial gain might result from the making of the allegedly false or misleading statements. Instead, a plaintiff must show defendants gained, or intended to gain, some sort of concrete benefit as a result of the false statements, such as insider trading of stock whose price was artificially inflated by false or misleading statements. *Shields,* 25 F.3d at 1130; *see also Turkish v. Kasenetz,* 27 F.3d 23, 28 (2d Cir.1994) (avoiding making payments to creditors a sufficient motive); *Cohen v. Koenig,* 25 F.3d 1168, 1174 (2d Cir.1994) (securing loans a sufficient motive). Making false or misleading statements to maintain an artificially inflated stock value or to maintain a generally positive public image of one's company are not sufficient motives for showing a strong inference because such generalized allegations describe the motives of "virtually every company in the United States that takes a downturn in stock price," *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995); *see also Shields,* 25 F.3d at 1130. Moreover, allowing such a de minimis showing of motive would effectively thwart the role of more vigilant gatekeeper against frivolous suits that Congress entrusted to the courts by means of § 78u–4(b)(2).

Plaintiff's Complaint fails to allege facts sufficient to demonstrate that either Itron or Humphreys stood to gain some concrete benefit from their allegedly false and misleading statements. All the Complaint alleges is that the statements were intended to maintain Itron's position in the business community by covering the alleged problems with its ERT technology in a fixed network environment while it sought for a technological solution to those problems. While Itron and Humphreys, who holds a substantial position in Itron's stock, stood to benefit in some manner from maintaining a positive view of Itron in the business community, this type of generalized allegation relating to motive is insufficient as a matter of law. Thus, Plaintiff's

Complaint fails to meet the motive and opportunity test.

This leaves only the second of the Second Circuit's alternative "strong inference" tests: allegations that amount to strong circumstantial evidence of scienter. Not surprisingly, this commonsense definition has not been challenged as an appropriate test of the "strong inference" requirements in other post-PSLRA cases. Because the applicability of this test also is not challenged by the parties in this case, it is applied to the facts of this case in the succeeding section.

**B. HAS PLAINTIFF PRESENTED STRONG CIRCUMSTANTIAL EVIDENCE OF SCIENTER?**

■ As it has been narrowed by the preceding analysis, the question for the Court is whether the factual allegations contained in Plaintiff's Complaint constitute strong circumstantial evidence that Defendants either recklessly disregarded or knew that the challenged statements were materially false or misleading. Because recklessness is the lower threshold, the Complaint must, at a minimum, present strong circumstantial evidence that Defendants engaged in an extreme departure from the standards of ordinary care by making statements that were so likely to be materially false or misleading that it is fair to infer Defendants were aware of the nature of their statements or omissions.

■ To create a strong inference of scienter, Plaintiff relies in part on the allegation that Itron's ERTs are inherently incapable of forming the basis of a functional fixed network meter-reading system. Because of the nature of Defendants' motion, this allegation must be assumed to be true. Less clear is whether Plaintiff's related allegation that Defendants knew of these flaws also must be assumed to be true.[11] There is no need to reach this question in this case, however, because Plaintiff's allegations meet even the demanding pleading standard of § 78u–4(b)(2). As the Second Circuit has noted, the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the

---

11. Arguably, the relaxed pleading requirement of Fed.R.Civ.P. 9(b)(2) should control because Plaintiff is alleging knowledge of underlying facts rather than knowledge of the false or misleading nature of the relevant statements.

company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income. *See Cosmas v. Hassett*, 886 F.2d 8, 10 (2d Cir. 1989) (attributing to directors knowledge of recently imposed import restrictions that directly affected company's prospective sales). In other words, facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. In this case, Plaintiff's allegations regarding the incompatibility of Itron's ERTs and its Fixed Network AMR are these types of facts. If it is true, as Plaintiff alleges, that Itron's core product is technologically incapable of meeting requirements that are central to Itron's continued survival as a business entity, it can be strongly inferred that key officers like Humphreys had knowledge of this fact.

This basis alone—knowledge of technological incompatibility—is sufficient to support a strong inference that Defendants knew or recklessly disregarded the false or misleading nature of their statements regarding Itron's Fixed Network AMR. Moreover, Plaintiff augments this showing by pointing to two specific statements by Itron that suggest Defendants knew their challenged statements were false or misleading.

The first of these statements, the 1993 marketing brochure, described in detail the various factors that affected the readability of transmissions from ERTs, and concluded:

> After considering all the things that affect readability, you can see it is not possible to simply stick a stationary receiving antenna up in the air and expect to read all meters within a range of a half-mile, one-tenth of a mile, or any other distance, for that matter.

*See* Attachment to Defendants' Reply Brief at 3. The probative value of this statement is attenuated by the rapid rate at which technology progresses in this day and age, and by the fact that the brochure was issued two years before the statements that Plaintiff contends were false or misleading. Nonetheless, because this statement indicates that at one time in the recent past Itron believed a meter-reading system relying on fixed receivers could not be based on its ERT technology, it is highly probative evidence on the

issue of whether Defendants knowingly or recklessly failed to divulge this "fact" in its statements. *Cf. Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992) (knowledge of technological flaws created genuine issue of material fact as to whether promoting flawed product constituted reckless conduct).

Plaintiff also points to the 1997 Form 10–K statement. Because the Form 10–K addressed difficulties Itron experienced in implementing a Fixed Network AMR system during 1996, a period that overlaps many of the allegedly false or misleading statements, this statement is relevant to the question of whether Defendants should have known that the failure to identify the flaws in that system were misleading. This statement's probative value is reduced, however, by the fact that it does not directly ascribe the delays Itron was experiencing to incompatibility between the ERTs with the Fixed Network AMR. While one reasonable inference from Itron's reference to problems with "the development of certain advanced meter reading functions and the software needed to complete these functions" is that Itron was aware that its ERTs could not support a fixed network approach, it is equally plausible that the delays in implementing what both parties describe as a complicated network based on leading edge technology have little to do with the ERT flaws described in Plaintiff's Complaint. Thus, this statement supports an inference that Defendants knew or recklessly disregarded the misleading nature of their statements, but that inference is not sufficient, on its own, to create a strong inference of recklessness.

Although these two statements might not be sufficient to satisfy § 78u–4(b)(2) on their own, they strengthen the already strong inference of scienter that is created by Plaintiff's allegation that Defendants knew that a fixed network system could not be based on ERTs. If it is true that Itron's Fixed Network AMR is fundamentally compromised by the decision to rely on existing ERT technology, it is reasonable to infer that both Itron and its longstanding CEO were aware of the flaws in its approach. The strong inference of scienter created by this knowledge is strengthened further by the 1993 marketing

brochure, which establishes that no more than two years prior to making any of the allegedly misleading statements, Itron believed that a fixed antenna was incapable of effectively reading ERTs in a specific area. The 1997 Form 10–K lends additional, though slight, strength to this inference by substantiating that Itron experienced meter reading and software programs in fielding its Fixed Network AMR during at least a portion of the relevant time frame. Viewed together, these three items create a strong inference that Defendants made the allegedly misleading statements in an effort to buy time while Itron searched for a technological fix to the meter readability problems identified in the 1993 marketing brochure. As such, Plaintiff's Complaint pleads with particularity sufficient facts to create a strong inference that Defendants either knew, or were reckless, as to the false or misleading nature of the statements challenged in this action. Accordingly, **IT IS HEREBY ORDERED:**

Defendants' Motion to Dismiss (**Ct.Rec.17**) is **DENIED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.