David DANIS, on behalf of himself and all others similarly situated, Plaintiff,

v.

USN COMMUNICATIONS, INC., J. Thomas Elliott, Gerald J. Sweas, Merrill Lynch & Co., Cowen & Company and Donaldson, Lufkin & Jenrette Securities Corporation, Defendants.

No. 98 C 7482.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 8, 1999.

Marvin Alan Miller, Kenneth A. Wexler, Miller, Faucher, Cafferty and Wexler, L.L.P., Chicago, IL, Paul O. Paradis, Marian P. Rosner, Wolf Popper, LLP, New York City, Samuel P. Sporn, Christopher Lometti, Schoengold and Sporn, P.C., New York City, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll PLLC, Seattle, WA, for David Danis.

Christina M. Tchen, Tiffanie Noelle Cason, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for USN Communications, Inc.

Christina M. Tchen, Paula Marie Stannard, Tiffanie Noelle Cason, Janet E. Byrne Thabit, Frances P. Kao, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for J. Thomas Elliott, Gerald J. Sweas.

Lee Ann Russo, David L. Carden, Jones, Day, Reavis & Pogue, Chicago, IL, for Merrill Lynch & Co., Inc., Donaldson Lufkin & Jenrette Securities Corp.

William F. Lloyd, David M. Schiffman, Lisa Maria Cipriano, Sidley & Austin, Chicago, IL, for Deloitte and Touche, L.L.P.

Paula Marie Stannard, Frances P. Kao, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Richard J. Brekka, Dean M. Grenwood, Donald J. Hoffman, Jr., James P. Hynes, William A. Johnston, Ian M. Kidson, Paul S. Lattanzio, David C. Mitchell, Eugene A. Sekulow.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Plaintiffs in this putative class action sue various defendants for violation of the securities laws in connection with the purchase of stock of USN Communications, Inc. ("USN") in 1998. Defendants seek to dismiss the consolidated class action complaint ("complaint") pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6), and § 21D(b) of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b).

## BACKGROUND

For purposes of a motion to dismiss, this court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). Before treating the substance of the allegations, it is necessary to describe the parties and claims.

## I. PARTIES AND CLAIMS

### A. Putative Plaintiff Class

The putative plaintiff class consists of two groups of purchasers of USN common stock: those who purchased stock pursuant to USN's registration statement/prospectus of February 2, 1998 and the final prospectus of February 4, 1998 (collectively, "registration statement/prospectus"), and those who purchased USN stock during the "class period" between February 4, 1998 (the date of USN's initial public offering) and November 20, 1998. Compl. ¶ 1.

### B. Individual Defendants

The individual defendants are: Thomas Elliot, USN's President and CEO since April 1996, Gerald Sweas, USN's Executive Vice President and Chief Financial Officer, and nine USN directors, most of whom either owned USN stock or represented entities owning USN stock at the time of the initial public offering: Richard Brekka, Dean Greenwood, Donald Hofmann, James Hynes, William Johnston, Ian Kidson, Paul Lattanzio, David Mitchell, Eugene Sekulow. *Id.* ¶¶ 16–26.

Plaintiffs contend these individual defendants, due to their stock ownership, status as high-level managers or directors, and/or representation of entities owning 84% of USN's common stock prior to the initial public offering, and 64% thereafter, had knowledge of and control over USN's operations and practices. *Id.* ¶¶ 27, 189.

### C. Underwriter Defendants

Plaintiffs sue three underwriter defendants who managed the underwriting of USN's initial public offering: Merrill Lynch ("Merrill"), Cowen & Company, ("Cowen"), and Donaldson, Lufkin & Jenrette ("DLJ"). Merrill served as the lead manager of the initial public offering, after investing more than $135 million in USN in the form of stock, warrants exercisable for stock, and notes convertible to stock. *Id.* ¶¶ 32,188. Merrill also brought in a number of venture capital firms to invest in USN prior to the initial public offering, the same firms represented by many of the individual defendants serving as USN directors. *Id.* ¶¶ 33,189. Plaintiffs sue the three underwriter defendants individually and as representatives of the class of all underwriters who participated in the initial public offering.

### D. Deloitte & Touche

Defendant Deloitte & Touche ("Deloitte") audited USN's financial statements for the 1996 and 1997 fiscal years. *Id.* ¶ 41. Deloitte also provided consulting services regarding USN's technical infra-

structure prior to and during the class period. *Id.*

### E. The Claims

In Count I, plaintiffs sue all defendants under § 11 of the Securities Act of 1933, ("Securities Act") and the individual defendants under § 15 of that Act. In Count II, plaintiffs sue the individual and underwriter defendants under § 12 of the Securities Act. In Count III, plaintiffs sue all defendants under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 promulgated thereunder. In Count IV, plaintiffs sue the individual defendants under § 20(a) of the Exchange Act.

## II. THE PURPORTED SCHEME TO "FLIP" USN

USN is a company spawned by the Telecommunications Act of 1996.[1] A primary goal of the act is to promote competition in local and long distance telecommunications markets. Among other things, the Act obligates Regional Bell Operating Companies ("RBOCs"), such as Ameritech, to open their local network monopolies to competition. This has resulted in the birth of companies known as "local telecommunications resellers," such as USN. These resellers purchase various local and long distance telecommunications services (such as local and long-distance telephone, voicemail, and paging services) from the RBOCs, "bundle" them into a single package of services, and then sell that package to the public. *Id.* ¶¶ 2,15. As a reseller, USN sought to persuade the RBOCs' existing customers to switch to USN by offering them packaged services for lower rates. *Id.* After gaining a new customer, USN would then have to "provision," or switch, the new customer from their existing telephone company over to USN. *Id.*

But according to plaintiffs, the individual and underwriter defendants never intended to develop USN as a going concern. *Id.* ¶ 52. They had no intention of designing, developing, or implementing the technical infrastructure and controls necessary to provide telecommunications services and operate as a viable company. *Id.* Instead, those defendants intended to "flip" USN—to take USN public, utilize the proceeds from the public offering to hire a sales force in order to quickly build the largest "book of business" of any reseller in the country, and to then sell USN and its account base to a larger, established telecommunications company that already had infrastructure and control systems in place. *Id.*

In order to accomplish this "flip" scheme, the individual defendants and Merrill issued numerous false statements prior to the initial public offering that conditioned the financial markets to believe that USN was experiencing impressive sales and revenue growth. *Id.* ¶ 50. Many of these statements touted USN's growth in relation to its competitors, stating the number of lines sold during various time periods, the productivity of its sales force, and its "state of the art" internal and provisioning systems. *Id.* ¶ 50. These defendants continued to issue similar false and misleading statements after the public offering, in the form of public press releases and annual and quarterly financial reports filed with the Securities Exchange Commission.

According to plaintiffs, the scheme almost worked. Less than one month after going public, GTE and AT & T contemplated purchasing USN and began performing due diligence. *Id.* ¶ 53. However, GTE and AT & T soon informed the individual defendants and Merrill that they would not purchase USN after discovering that USN lacked the technological infrastructure and customer account base that USN claimed it possessed. *Id.* ¶ 55. GTE and AT & T also revealed that because USN lacked the necessary systems, they had been unable to determine or confirm the number of lines purportedly sold and provisioned, the size of USN's customer

---

1. Because USN has filed for bankruptcy protection, it is no longer a party to this action.

base, and USN's reported revenue, accounts receivable, and assets. *Id.* ¶ 55.

Despite this knowledge that the "flip" strategy had failed, that USN lacked the provisioning and billing systems long touted by the individual defendants and Merrill, and that USN's reported revenue, accounts receivable, and operating results were inaccurate due to USN's lack of infrastructure and internal controls, plaintiffs claim that the individual defendants continued to issue numerous false and misleading statements throughout the class period. *Id.* ¶ 57.

Plaintiffs assert that on November 3, 1998, "the truth concerning USN's dire financial condition slowly began to emerge" and that on November 20, 1998, they learned more about "the true state of financial affairs at USN." *Id.* ¶¶ 179,180. On November 3, USN issued a press release announcing its restructuring in order to drastically reduce its spending. *Id.* ¶ 179. The release explained that USN planned to eliminate 650 positions (approximately 46% of its workforce), primarily in its direct sales department. *Id.* According to the release, the restructuring was necessitated by USN's inability to secure additional capital for expansion and its resulting wish to focus on serving its existing customer base. *Id.* USN echoed these points in another release issued on November 20. *Id.* ¶ 180. As of November 20, USN's stock closed at $.50 per common share; at the time of the initial public offering, the stock was worth $16.00 per share, and at its high point during the class period, $23.00 per share. *Id.* ¶ 181.

## III. USN'S INTERNAL PROBLEMS AND SUBSEQUENT MISREPRESENTATIONS

Plaintiffs claim that prior to and during the class period, defendants made numerous materially false and misleading statements that (1) misrepresented USN's provisioning capabilities, billing capabilities, and technological infrastructure, (2) overstated USN's revenues, accounts receivable, assets, and number of access lines purportedly sold and provisioned, and (3)

understated USN's allowance for doubtful accounts, expenses, and net loss. *Id.* ¶¶ 3, 51.

First, USN reported fictitious revenue in a manner contrary to its stated revenue recognition policy and generally accepted accounting principles. This occurred because USN reported as "earned" that amount of revenue it believed it would receive from a new customer, even though it had not yet "provisioned" the customer over to USN or provided any services to the customer. *Id.* ¶¶ 65,66,67.

Second, USN reported fictitious sales. USN's salespeople were paid on a commission basis and would not receive any commission if they did not reach 50% of their monthly quota. As such, plaintiffs allege these salespeople routinely reported sales that did not actually occur—anywhere from 30–40% of all reported new sales—in order to meet their quota. *Id.* ¶¶ 71,73. According to plaintiffs, defendants Elliot and Sweas often instructed the sales force to add a week or two to the quarter in order to "get the numbers up." *Id.* The sales managers who oversaw the sales department received a partial payment for every dollar earned by the sales department. *Id.* ¶ 75. Plaintiffs assert that this led managers to approve new sales they knew to be fictitious to collect their extra payment. *Id.* ¶¶ 76,77.

Third, USN misrepresented its electronic provisioning capabilities. USN repeatedly boasted of its industry-leading electronic proprietary and provisioning interface systems and that these systems enabled it to provision more lines than would be possible if it had to provision orders by mail or facsimile. *Id.* ¶ 78. However, USN did not actually possess the capacity to provision new orders electronically because it tried, unsuccessfully, to combine a number of antiquated computer programs incapable of interfacing with each other. *Id.* ¶ 79. Because USN lacked the infrastructure to provision the orders electronically, the orders had to be provisioned manually. *Id.* But manual

processing took much longer; a two to three month lag often occurred between the time of a new sale and the time that new customer was actually provisioned over to USN. *Id.* ¶ 83. As a result of the delay, many customers who initially agreed to become USN customers later refused to be provisioned when actually contacted by USN. However, USN continued to report revenue earned from these customers even though they had never been provisioned or provided services by USN. *Id.* ¶ 89.

Fourth, at the time of the initial public offering and for most of the class period, USN failed to disclose its inability to bill its customers. *Id.* ¶¶ 94–95. USN advertised its ability to provide an integrated bill containing all of a customer's telecommunications service charges—local, long distance, paging, Internet, and cellular services—on a single statement. *Id.* ¶¶ 94,97. However, USN did not have any automated billing system and could not generate these bills. *Id.* ¶¶ 95,98. In fact, beginning in July 1997 and lasting through July 1998, USN retained a team of Deloitte information technology consultants to design a functioning billing system. *Id.* ¶ 95. The inability to bill customers severely compromised USN's cash flow and resulted at one point in 71% of USN's accounts receivable going unbilled. *Id.* ¶¶ 95,96,100. When USN's billing system was finally completed in July 1998, it still lacked the ability to properly process many of the charges imposed by the RBOCs. This resulted in many bills being late, sometimes up to nine months, and incorrect by material amounts. *Id.* ¶¶ 98,99,101. The net effect of these problems was overstated accounts receivable and asset amounts, and understated amounts of doubtful accounts. *Id.* ¶ 102.

Fifth, plaintiffs allege that the vast majority of USN's accounts receivable were uncollectible. They claim that by Fall 1998, USN had amassed over $70 million in accounts receivable, totaling 33% of USN's assets, but that a material portion of this amount could not be collected because it resulted from improperly recorded sales. *Id.* ¶ 104. Instead of increasing its allowance for doubtful accounts or writing off uncollectible receivables, USN continued to carry these receivables on its books throughout the class period, causing its financial statements to be materially false and misleading. *Id.* ¶¶ 105,110.

### DISCUSSION

## I. CLAIMS UNDER SECURITIES ACT OF 1933

■ Plaintiffs assert two claims under the Securities Act. They sue all defendants under § 11, which prohibits the issuance of false or misleading securities registration statements, including the portion of the registration statement that circulates as the prospectus. *See* 15 U.S.C. § 77k; *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1390 (7th Cir.1990). Plaintiffs sue the individual defendants and the underwriter defendants under § 12(a)(2), which imposes civil liability on any person who makes a false or misleading statement in the offer or sale of a security, whether in an oral communication or prospectus. *See* 15 U.S.C. § 77l(a)(2).[2] Defendants challenge plaintiffs' Securities Act claims on two primary grounds: that plaintiffs lack standing under § 11, and that no materially false or misleading misrepresentations were made.[3]

---

**2.** Plaintiffs also sue the individual defendants for "control group" liability under § 15 of the Securities Act, 15 U.S.C. § 77o, based on the predicate violations of §§ 11 and 12. The only ground upon which the individual defendants seek dismissal of the § 15 claim is that plaintiffs fail to state claims under §§ 11 and 12. Because the court finds that plaintiffs have properly plead a § 11 claim, the § 15 claim must withstand dismissal.

**3.** The individual defendants also assert that plaintiffs lack standing to sue under § 12 of the Securities Act. Because this court finds that plaintiffs have not alleged facts supporting an inference that the individual defendants are "sellers" within the meaning of § 12, the § 12 claim against the individual defendant is dismissed on those grounds. Thus, there is no need to address the individual defendants' § 12 standing argument.

## A. PLAINTIFFS' STANDING

■ According to defendants, § 11 protects only those who purchase stock in an initial public offering. They argue, albeit sparingly, that plaintiffs lack standing to sue under § 11 because plaintiffs fail to plead that they purchased USN stock directly in the public offering and that the most plaintiffs can allege is that they purchased USN stock in the open market traceable to the public offering.

Defendants base their argument on the Supreme Court's decision in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). At issue in *Gustafson* was what constitutes a "prospectus" under § 12 of the Securities Act. Section 12(a)(2), in relevant part, creates liability for material misrepresentations or omissions in connection with the sale of securities "by means of a prospectus." *See* 15 U.S.C. § 771(a)(2). *Gustafson* explained that a prospectus "is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder," and held that the private, secondary sales contract in that case did not constitute a prospectus under § 12(a)(2). *Gustafson*, 513 U.S. at 584, 115 S.Ct. 1061.

*Dicta* in *Gustafson* supports the view that only those who purchase securities in a public offering under the prospectus may assert a § 12(a)(2) claim. *See id.* at 571–72, 115 S.Ct. 1061. In addition, *Gustafson* explained that § 12 is a companion to § 11 and that the Securities Act as a whole is "chiefly concerned with disclosure and fraud in connection with ... initial distributions of newly issued stock from corporate issuers." *Gustafson*, 513 U.S. at 572 (citations omitted). Defendants try to connect *Gustafson*'s statements regarding § 12(a)(2) standing to plaintiffs' § 11 claims here. They argue that just as a plaintiff may not assert a § 12(a)(2) claim unless it purchases stock in the initial offering, so too must a plaintiff purchase stock in the initial offering in order to assert a § 11 claim; merely being able to

"trace" a stock purchase to the initial offering is not enough.

But *Gustafson* does not preclude § 11 standing because *Gustafson* dealt with a claim under § 12, not § 11. It is true that some district courts have dismissed § 11 claims where plaintiffs failed to allege that they purchased stock in the initial public offering, presumably because there is "no material distinction between § 11 ... claims and those raised under [§ 12(a)(2) ] from the standpoint of the standing of after-market purchasers." *Murphy v. Hollywood Entertainment Corp.*, 1996 WL 393662, at *4 (D.Or. May 9, 1996). However, the only circuit court to consider the issue has decided otherwise, and done so persuasively. In *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999), the Ninth Circuit concluded that a plaintiff who purchases stock on the open market after the initial offering has standing to sue under § 11. *Hertzberg* based its decision on the plain language of § 11, and bolstered that conclusion with reference to legislative history. And significantly, after consulting these sources, *Hertzberg* rejected the argument advanced by defendants here—that *Gustafson*'s *dicta* concerning § 12 standing should apply to § 11.

*Hertzberg* acknowledged that § 11 and § 12 are parallel statutes, but it also noted that "their wording is significantly different as to who can bring a suit:"

Section 11 permits suit without restriction by "any person acquiring such security." Section 12, by contrast, permits suit against a seller of a security by prospectus only by "the person purchasing such security from him," thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus. 15 U.S.C. § 771(a)(2).... Congress's decision to use "from him" in Section 12 but not in Section 11 must mean that Congress intended a different meaning in the two sections.

*Id.* at 1081. Thus, the text of § 12 grants a cause of action only to those who purchase "from" "a seller of a security by prospectus"—in an initial public offering. Section 11 contains no restriction on the class of potential claimants. In light of the facial differences between § 11 and § 12, and absent further pronouncement from the Supreme Court or the Seventh Circuit, this court chooses to follow *Hertzberg.* As a result, defendants' § 11 standing arguments must be rejected.

## B. FALSE AND MISLEADING STATEMENTS

### 1. Applicability of Fed.R.Civ.P. 9(b)

Defendants challenge plaintiffs' Securities Act claims on the ground that no false or misleading statements were made. But before addressing the substance of the alleged misstatements, this court must address defendants' argument that plaintiffs' §§ 11 and 12 claims must meet Fed. R.Civ.P. 9(b)'s requirement of pleading fraud with particularity. While §§ 11 and 12 do not require plaintiffs to demonstrate fraud in order to prevail, defendants argue that the whole of plaintiffs' complaint essentially sounds in fraud, and therefore, the §§ 11 and 12 claims must satisfy Rule 9(b).

It remains unsettled in this circuit whether Rule 9(b)'s requirement of particularity when pleading fraud applies to §§ 11 and 12 claims. Defendants cite *Sears v. Likens,* 912 F.2d 889, 892–93 (7th Cir.1990) as authority for the proposition that Rule 9(b) applies. While *Sears* applied Rule 9(b) to §§ 12 and 15 claims under the Securities Act, *Sears* did not determine whether Rule 9(b) properly applied to those claims. Other judges of this court have declined to read *Sears* as requiring § 11 claims to meet Rule 9(b). *See, e.g., In re First Merchants Acceptance Corp. Securities Litigation,* 1998 WL 781118, at *11 (N.D.Ill. Nov. 4, 1998) (Coar, J.). As *First Merchants* noted, the Eight Circuit recently and persuasively explained why Rule 9(b) should not apply to claims under the Securities Act. *See In re NationsMart Corp. Securities Litigation,*

130 F.3d 309 (8th Cir.1998). First, *NationsMart* noted that where a complaint, like the one here, expressly disavows any claim of fraud in connection with its § 11 claim, those decisions holding that § 11 claims grounded in fraud are subject to Rule 9(b) do not apply. *Id.* at 315; *In re First Merchants Acceptance Corporation Securities Litigation,* 1998 WL 781118, at *11; Compl. ¶¶ 212, 221. Second, *NationsMart* explained that "a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure." *NationsMart,* 130 F.3d at 315. Because claims under §§ "11 [and 12] do not require proof of fraud for recovery, Rule 9(b)'s pleading requirements are inapplicable." *In re First Merchants,* 1998 WL 781118, at *12.

In any event, defendants' argument is moot because plaintiffs allege false and misleading statements with particularity. The complaint, in excess of one hundred pages, quotes each alleged misstatement and identifies the document or release in which the statement was made, the speaker or author, and explains why the statement was false and misleading. The portions discussed in the following section are illustrative.

### 2. Statements in Registration Statement/Prospectus

In order to state claims under both the Securities Act and the Exchange Act, plaintiffs must properly allege that defendants made false and misleading statements. The complaint details at length numerous allegedly false and misleading statements made in the registration statement/prospectus and made thereafter during the class period. On this motion, the court will only treat the allegedly false and misleading statements in the registration statement/prospectus because: (1) those

statements suffice to support claims under both the Securities Act and the Exchange Act, (2) the parties devote the lion's share of their briefing to discussing those statements, and (3) the subsequent statements made during the class period are, by and large, of the same general nature as those contained in the registration statement/prospectus and additional analysis would be duplicative.

### a. Statements Attributable to the Individual and Underwriter Defendants

■ The complaint sufficiently alleges numerous false and misleading statements in the registration statement/prospectus attributable to the individual and underwriter defendants. For example, plaintiffs quote from the "Competitive Advantages" subheading of the registration statement/prospectus, which stated (in relevant part) that USN "was among the first CLECs to develop electronic provisioning systems for resale of RBOC services," and explained that the "[e]lectronic provisioning between [USN] and its RBOC vendors allows [USN] to provision a significantly greater volume of lines than would be possible if transmitting orders by mail or facsimile." Compl. ¶ 117. In the next paragraph, plaintiffs state:

> The statements set forth in the foregoing paragraph were materially false and misleading at the times they were made based on the fact that [USN] did not possess "electronic provisioning systems," and that [USN] had therefore not been among "the first CLECs to develop electronic provisioning systems for resale of RBOC services." Moreover, defendants also falsely represented that these electronic provisioning systems "allow[ed][USN] to provision a significantly greater volume of lines than would be possible if transmitting orders by mail or facsimile," because all of [USN]'s provisioning was done manually—not electronically. Finally, [USN]'s "Proprietary Electronic Provisioning and Interface Systems" did not provide USN with a "Competitive Advantage" as

defendants had claimed because these systems simply did not exist. Compl. ¶ 118.

As another example, plaintiffs quote the "Prospectus Summary" and "Business" sections of the registration statement/prospectus. These sections described USN as "one of the fastest growing" CLECs, as providing customers with "a customized package of telecommunications services on a single bill," and as stating that during 1997, USN increased the number of local access lines in service from 8,364 to 171,962 and provisioned 55,371 lines in the fourth quarter of 1997. Compl. ¶ 115. Plaintiffs contend these statements were false and misleading for three reasons: (1) the "growth" described was illusory since USN lacked the technology to rapidly provision customers buying accounts with USN, and therefore, when USN salespeople contacted those new customers months later to provision them, many of the customers changed their mind and decided not to become USN customers, (2) at the time of the initial public offering and for much of the class period, USN lacked the ability to bill customers at all, much less generate a single integrated bill, and (3) USN lacked the capacity to properly identify and track the number of lines sold and provisioned, so that any figures regarding those numbers were false and misleading. Compl. ¶ 116. Allegations like these typify those throughout the complaint, and further recitation of the complaint would not be fruitful.

Defendants, in arguing that the above statements were not false or misleading, assert that materiality must be determined based on the "total mix" of information available to the investor, and that when taken as whole, the registration statement/prospectus fully disclosed the nature of an investment in USN and the attendant risks involved. They cite a ten-page section in the registration statement/prospectus entitled "Risk Factors," and argue that it explicitly addressed USN's provisioning problems, USN's sales practices, difficulties with billing and collections, and

the effects of those problems on revenue. The risk factor section cautioned that continual growth would burden USN's ability to provision additional customers and other internal information systems, and warned that "there can be no assurance that such systems will be adequate to manage [USN's] anticipated expansion." Ind. Def. Mot. Dism. at 23–24. They also note the prospectus stated that USN had experienced operating losses since its inception in April 1994, and that these losses were likely to continue as USN continued to expand within "the foreseeable future." Id. at 29. Finally, they cite Deloitte's conclusion in the prospectus that continued operating losses experienced by USN "raise substantial doubt about [USN's] ability to continue as a going concern." Id. at 28. In light of these statements, defendants contend that the "investing public could not have been under any misconception that the financial condition and prospects of USN was anything other than that the [it] had been operating on negative earnings for several years and expected to operate on negative earnings for the foreseeable future." Id. at 32.[4]

In so arguing, defendants invoke the "bespeaks caution doctrine." That doctrine provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the foreword-looking statements may not be misleading." Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392, 1404 (7th Cir.1995) (citations omitted). But to be effective, the cautionary language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Harden, 65 F.3d at 1404.

In this case, the cautionary language invoked is not "tailored to" the statements challenged by plaintiffs. The language cited by defendants may have cautioned against potential risks, continued operating losses, or continued billing and provisioning problems. However, these are simply not the problems alleged. Instead, plaintiffs allege particular deficiencies in discrete areas of USN's operations that existed at the time of the initial public offering and that defendants failed to disclose—deficiencies like USN's nonexistent or ineffective provisioning and billing infrastructure, and its failure to collect receivables. USN's disclosure that it was dependent on its billing systems and that its growth placed a strain on these systems does not address the heart of plaintiffs' claim: that there was no functioning billing system in existence when the statements were made and for most of the class period. See Compl. ¶¶ 57, 95–96, 98–99. Talk of problems potentially incurred by billing systems implies that the systems exist. If the systems did not exist, defendants' statements were misleading.[5]

---

4. In addition to arguing that the registration statement/prospectus contained sufficient warnings of risk, defendants attack a few of the alleged misstatements head on. For instance, they note that the registration statement/prospectus described a failure to provision customers in Manhattan pursuant to an agreement with NYNEX and that USN's growth in 1997 strained billing systems such that USN experienced delays in billing customers in a timely manner, resulting in a recorded charge of $2.8 million in the third quarter of 1997. These statements in the prospectus do not require dismissal, however. First, they do not directly address plaintiffs' contention that rapid provisioning and billing systems did not exist. Second, without discovery, plaintiffs cannot be expected to detail the full extent of the provisioning and billing problems. While the prospectus mentions a failure to provision customers in Manhattan, this does not necessarily foreclose failures in other markets.

5. The individual defendants cite this court's decision in In re VMS Securities Litigation, 752 F.Supp. 1373 (N.D.Ill.1990) for the proposition that claims based on upon a prospectus are to be dismissed where the defendants adequately disclosed the nature of the investment prior to the plaintiffs making their investment. That is true. But in VMS, the plaintiffs claimed that the prospectuses misled them into believing that the investment was "safe" or "conservative." Plaintiffs here do not claim they were misled about the nature of investment in USN—whether it was "safe" or "risky"—but rather, that defendants did not disclose the true state of USN's operations.

Plaintiffs protest that many of USN's figures, such as reported revenues, accounts receivable, new sales, and lines sold and provisioned, were false, fictitious, and/or materially overstated at the time of the initial public offering; they do not allege that future totals for these figures failed to meet some projected amount in the future. As plaintiffs correctly note, "warnings of future risks cannot adequately caution against a misstatement of historical, present facts." Pl. Resp. at 27; *see Harden* 65 F.3d at 1405; *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir.1981), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). Defendants attempt to paint the situation as not involving securities fraud, but simply "garden-variety management difficulties." *Id.* at 33 n. 9. While allegations of mere mismanagement or a downturn in a firm's success, without more, do not give rise to securities fraud, *see DiLeo v. Ernst & Young*, 901 F.2d 624, 627–28 (7th Cir. 1990); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.1981), plaintiffs allege more than simple mismanagement. As already discussed, plaintiffs allege in abundant detail that numerous facets of USN's operating systems and infrastructure did not exist, did not function at all, or did not function adequately, and that as a result, many of USN's reported figures regarding lines provisioned and sold, accounts receivable, revenue, doubtful accounts, and losses were inaccurate, but that these material facts were not disclosed.[6]

Defendants argue that the complaint is "schizophrenic"—that portions of the complaint contain allegations that undermine and contradict claims elsewhere in the complaint. A review of defendants' arguments on this point reveals that plaintiffs have not alleged flatly inconsistent facts such that they have plead themselves out of court; rather, defendants choose to construe plaintiffs' allegations in a light favorable to themselves. However, on a motion to dismiss, all factual inferences are drawn in the plaintiffs' favor. For instance, defendants note plaintiffs allege that USN never disclosed that a significant portion of its receivables were unbilled. Defendants note that plaintiffs nevertheless allege that USN's public reports did disclose that "more than 71 percent of [USN's] accounts receivable had not been billed." Ind. Def. Mot. Dism. at 26. But drawing all inferences in plaintiffs' favor (and reading the whole of the relevant paragraphs in the complaint), these allegations are not mutually contradictory. In the same paragraph containing the second allegation, plaintiffs also allege that defendants falsely stated that the unbilled receivables referred to had been billed within 45 days, because most of these receivables were at least three months late. Compl. ¶ 100. Plaintiffs do not rest their claims of falsehood here on the contention that USN said nothing about its failure to collect its receivables; rather, the falsehood arises from USN's representation that unbilled receivables were being billed within 45 days.

---

6. Plaintiffs need not state the amount by which USN's financial statements were in error. While this information is absent from the complaint, and while plaintiffs will be required to fill in these details in order to prevail on their claims, "most of this information is in the hands of the defendants ... and plaintiffs have satisfied their burden at this stage of the litigation." *In re First Merchants*, 1998 WL 781118, at *8 (citing *DiVittorio v. Equidyne Extractive Industries Inc.*, 822 F.2d 1242, 1247 (2nd Cir.1987) (noting that requirements of Rule 9(b) are to be relaxed where the facts are "peculiarly within the adverse parties' knowledge")). As it currently stands, the complaint alleges which portions of USN's financial statements were overstated—revenue, lines sold, accounts receivable—and which portions were understated—losses, expenses, and doubtful accounts. This is sufficient to permit defendants to prepare a defense to the allegations. *See In re First Merchants*, 1998 WL 781118, at *9.

### b. Statements Attributable to Deloitte

■ Plaintiffs allege material misrepresentations by Deloitte in the registration statement/prospectus. The registration statement/prospectus incorporated Deloitte's March 14, 1997 "Independent Auditor's Report," which Deloitte prepared after its 1997 audit of USN's financial statements. The report stated that USN's consolidated financial statements present "fairly, in all material respects, the financial position of [USN] as of December 31, 1997 and 1996, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1997, in conformity with generally accepted accounting principles." Compl. ¶ 200. Deloitte's report did contain a warning that USN's recurring losses raised substantial doubt about its ability to continue as a going concern.

But plaintiffs contend the above statement (and others like it), even with the warning, was false for reasons already detailed: that USN was not properly reporting revenue, was not properly processing its bills and receivables, and lacked the internal controls necessary to the proper functioning of its operations. For the reasons discussed with respect to the individual and underwriter defendants' statements, these allegations suffice. And the "going concern" warning is akin to those warnings contained in the "Risk Factors" portion of the registration statement/prospectus—it did not reveal the false and misleading nature of USN's financial statements, namely, the numerous internal failures and improper accounting practices that underlay USN's losses.

### C. THE INDIVIDUAL DEFENDANTS ARE NOT STATUTORY SELLERS UNDER § 12(A)(2).

■ While stating a § 11 claim against all defendants, plaintiffs fail to state a § 12(a)(2) claim against the individual defendants. Under the Supreme Court's decision in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), § 12(a)(2) liability extends only to those who pass title of securities or solicit their sale. The individual defendants did not sell or pass title of USN's stock because USN's stock was sold to the public by the underwriter defendants pursuant to a "firm commitment" underwriting. Therefore, the individual defendants can only be liable if they solicited the purchase of the stock. But plaintiffs fail to allege this. While plaintiffs assert that paragraphs 223 and 224 of the complaint allege the individual defendants' solicitation, these paragraphs allege only the underwriter defendants' solicitation—that they participated in "road shows" to promote the sale of USN stock. Accordingly, plaintiffs' § 12(a)(2) claim against the individual defendants must be dismissed.

### II. CLAIMS UNDER § 10(B) OF THE EXCHANGE ACT

■ Plaintiffs assert violations of § 10(b) of the Exchange Act and Rule 10b–5 against all defendants. To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege: (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) in connection with the purchase or sale of securities, (5) upon which plaintiff relied, and (6) that reliance proximately caused the plaintiff's injuries. *See In re HealthCare Compare Corp. Securities Litigation,* 75 F.3d 276, 280 (7th Cir.1996).

### A. Scienter Pleading Requirements

■ The parties vigorously contest whether plaintiffs have adequately alleged defendants' scienter under § 10(b). The recently enacted Private Securities Litigation Reform Act ("PSLRA") controls the manner in which plaintiffs must plead scienter under § 10(b). Section 21D(b) of the PSLRA provides that a complaint must "state with particularity facts giving rise to a strong inference" that a defendant acted with scienter. 15 U.S.C. § 78u–4(b)(2).[7] Section 21D(b) effectively

---

7. In addition, a plaintiff must satisfy the requirements of Fed.R.Civ.P. 9(b), which requires that "the circumstances constituting fraud ... be stated with particularity." *Id.* at 281. This means the "who, what, when,

codified the standard employed by the Second Circuit, which required a plaintiff "to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2nd Cir.1991); see *In re First Merchants Acceptance Corp. Securities Litigation*, 1998 WL 781118, at *7 (N.D.Ill. Nov. 4, 1998).

The parties primarily dispute the facts that may properly support a "strong inference" of scienter under the PSLRA. While the PSLRA directs plaintiffs to plead facts supporting a "strong inference" of scienter, the statute does not elaborate upon the factual requirements. The Second Circuit permits two types of facts to establish the required "strong inference" of scienter: (1) facts showing the defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2nd Cir.1999); *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2nd Cir.1994). Plaintiffs argue that in addition to codifying the Second Circuit's "strong inference" standard for pleading scienter, the PSLRA also meant to preserve these two factual tests employed by the Second Circuit to determine whether that standard was met. Defendants counter that Congress passed § 21D(b) of the PSLRA in order to raise the pleading bar higher than the Second Circuit's prior tests, so that now, a plaintiff cannot show a "strong inference" of scienter by merely offering facts showing a defendant had motive and opportunity.

Defendants are correct to a point, although a closer review of the cases cited reveals that the PSLRA did not wholly abolish reliance upon motive and opportunity facts. The PSLRA did not change the substantive standards of the securities laws. Rather, the act modified plaintiffs'

pleading requirements in order to survive a motion to dismiss. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283–84 (11th Cir.1999); *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 548–49 (6th Cir. 1999); *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 534 (3rd Cir.1999); *In re Spyglass, Inc. Securities Litigation*, 1999 WL 543197, at *7 (N.D.Ill. July 21, 1999).

■ Thus, the change worked by the PSLRA is to require the showing of a "strong inference" of scienter by pleading particularized facts. The only requirement in the text of the PSLRA is that the facts must support "a strong inference" of scienter; motive and opportunity facts are not precluded to establish this strong inference. Motive and opportunity facts may still be used to establish scienter, as long as they meet the mandate of § 21D(b)—those facts must simultaneously support a strong inference "that the defendant acted recklessly or knowingly, or with the requisite state of mind." *Comshare*, 183 F.3d at 551; *see also Bryant*, 187 F.3d 1271, at 1286 (holding that allegations of motive and opportunity "without more, are not sufficient to demonstrate the requisite scienter," although "allegations of motive and opportunity may be relevant to a showing of [scienter]"); *Advanta*, 180 F.3d at 535 ("motive and opportunity, like all other allegations of scienter ... must now be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter"); Matthew Roskoski, Note, *A Case–By–Case Approach to Pleading Scienter Under the Private Securities Litigation Reform Act of 1995*, 97 Mich. L.Rev. 2265 (1999) (concluding that the PSLRA focuses on the case-specific inquiry of whether a plaintiff has raised a strong inference of scienter and that courts "should have no presumptions in favor of or against fixed formalistic catego-

---

where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). In securities fraud cases, Rule 9(b) requires that a plaintiff plead the element of scienter with a

sufficient level of factual support; "the complaint ... must afford a basis for believing that plaintiffs could prove scienter." *Health-Care Compare Corp.*, 75 F.3d at 281 (quoting *DiLeo*, 901 F.2d at 629).

ries such as 'motive and opportunity' "). As noted by the Sixth Circuit in *Comshare,* "the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter;" however, "facts regarding motive and opportunity may be 'relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred,' and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *Comshare,* 183 F.3d at 551 (quoting *In re Baesa Securities Litigation,* 969 F.Supp. 238, 242 (S.D.N.Y.1997)).

Thus, the PSLRA's focus is on whether plaintiffs have plead with particularity facts establishing a "strong inference" that the defendants acted with scienter. The *types* of facts they choose to use in this pursuit—for instance, motive and opportunity facts—are of no consequence as long as those facts establish the strong inference of scienter.[8]

■ But the question remains, what constitutes "scienter" under § 10(b)? Scienter under § 10(b) is either the "intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) or the "reckless disregard for the truth of the material asserted," whether by commission or omission. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044 (7th Cir.1977). *See also SEC v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998) ("Reckless disregard of the truth counts as intent" for purposes of scienter). "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of

ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill. 1997) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)). Under the PSLRA, plaintiffs must allege particular facts giving rise to a strong inference that defendants acted, at a minimum, recklessly. The court will examine plaintiffs' allegations of scienter as to each of the defendant groups.

## B. Individual Defendants

■ Plaintiffs allege numerous facts, that, when viewed as a whole, support a strong inference that the individual defendants either knew or recklessly disregarded that the challenged statements in the registration statement/prospectus and subsequent public filings and disclosures were false.

First, plaintiffs allege pervasive problems at USN. As high-level USN managers and directors, the individual defendants may be presumed to have been aware of these problems. Plaintiffs complain of deficiencies in USN's provisioning, billing, and accounting systems, systems core to USN's existence. They also allege severe improprieties regarding the manner in which USN represented various figures, such as sales and revenue, in its financial documents. It is permissible to attribute knowledge, or at least reckless disregard, of these problems to the individual defendants. As recently explained in *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1325–26 (E.D.Wash.1998),

---

**8.** In addition to requiring the pleading of facts giving rise to a strong inference of scienter, the PSLRA requires plaintiffs, when making allegations based on information or belief, to plead "with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Defendants argue that plaintiffs fail to meet this requirement. They contend that ¶ 9 of the complaint merely refers to investigations conducted by plaintiffs' attorneys, reviews of USN's public filings, statements, and reports, and consultation with employees and

other people knowledgeable about USN's state of affairs, but that these bases are insufficient. The court rejects this contention for two reasons. First, reliance upon USN's SEC filings and press releases is sufficient to meet the requirements of the PSLRA. *See Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 232 (D.Mass.1999). In addition, the complaint as a whole alleges with sufficient particularity the sources upon which plaintiffs' information and belief allegations are based.

the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income.... [F]acts critical to a business's core operations ... generally are so apparent that their knowledge may be attributed to the company and its key officers.

*Epstein* went on to conclude that if a plaintiff alleges that a company's "core product is technologically incapable of meeting requirements that are central to [the company's] continued survival as a business entity, it can be strongly inferred that key officers ... had knowledge of this fact." *See also Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 232 (D.Mass.1999) ("As a matter of law, ... courts have held that certain information, particularly 'facts critical to ... an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers.'") (quoting *Epstein,* 993 F.Supp. at 1326); *In re Ancor Communications, Inc.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998) (knowledge of facts related to the defendant's $30 million contract could be imputed to the company and its officers and that knowledge evidenced a strong inference of scienter).[9] Here, imputation is strengthened by plaintiffs' allegation that USN's problems were readily discovered by potential acquirers AT & T and GTE. Problems readily recognized by an outsider can be presumed to be known to a company's management and directors.

Second, plaintiffs claim that USN retained a team of Deloitte consultants for thirteen months in order to develop a functioning billing system. Prior to the initial public offering, Deloitte prepared a "Summary of Findings and Recommendations" report detailing USN's lack of technological infrastructure—including provisioning and billing deficiencies—and presented the report to the individual defendants. The individual defendants' receipt of this report further supports an inference that they had scienter.

The individual defendants make much of plaintiffs' allegation that because USN's salespeople were paid on commission, they had an incentive to overstate sales and, therefore, USN's sales figures were overstated. The individual defendants argue that allegations of compensation based on a performance incentive cannot support an inference of fraud. However, the case they cite, *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994), is inapposite. While *Tuchman* opined that incentive compensation cannot be the basis of fraud allegations, that case dealt with the incentive compensation of corporate executives, and whether such compensation could give rise to an inference of *those*

**9.** The individual defendants argue plaintiffs must allege facts tying each of them to the alleged misconduct. They assert that plaintiffs may not rely on the doctrine of "group pleading"—that a company's statements may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company—because the group pleading presumption did not survive the PSLRA. *See, e.g., Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998). However, other courts have held otherwise. *See, e.g., In re Oxford Health Plans, Inc., Securities Litigation,* 187 F.R.D. 133 (S.D.N.Y.1999).

The individual defendants also argue there is a distinction between "inside" and "outside" directors, and that outside directors, who have less involvement with company operations, cannot be presumed to be aware of those operations. This may be true, but plaintiffs describe the individual defendants as having "high-level" positions in USN such that they were familiar with the "day-to-day operations of [USN] at the highest levels." Compl. ¶ 29. This suffices. Until receiving clarification from the Seventh Circuit, this court is unwilling to read the PSLRA as abolishing all remnants of notice pleading and the liberal standards under which motions to dismiss are viewed. The exact extent of each of the individual defendant's role and duties within USN, and their corresponding knowledge, cannot be ascertained until after discovery. Plaintiffs' recovery against any particular defendant will depend on actual proof tying that defendant to a material misrepresentation.

*executives'* fraudulent intent. Here, plaintiffs do not contend that the commission payment system for USN salespeople motivated the individual defendants' fraud. Rather, the commission payment system gave the *salespeople* an incentive to overstate sales. Its only relevance is to explain why sales figures were overstated, and not to show what motivated the individual defendants. The fraud comes from the individual defendants' then proceeding to conceal those overstatements.

Third, plaintiffs allege that USN failed to accurately increase its allowance for doubtful accounts and maintained other false entries on its books, both in violation of generally accepted accounting procedures. While these violations are insufficient, standing alone, to establish scienter, they may buttress other facts supporting a finding of scienter. *In re Digi International, Inc. Securities Litigation,* 6 F.Supp.2d 1089, 1098 (D.Minn.1998); *Rehm,* 954 F.Supp. at 1255–56.

Finally, plaintiffs' allegations of scienter are buttressed by their allegations of motive. Plaintiffs state that the individual defendants planned to quickly develop a large "book of business"—a large customer base on paper—and then sell USN to an established telecommunications company for a quick profit. To do so, they needed to raise capital to hire a sales force to build that book of business. So, they decided to take USN public.

The individual defendants argue that this "scheme" simply does not make sense, because any rational and established potential acquirer would conduct its own review of USN's internal operations prior to purchase instead of relying on the individual defendants' representations. The acquirer would easily discover USN's problems during its pre-purchase investigation, and would therefore not pay a premium price for USN, if they decided to buy it at

all. But plaintiffs need not allege that the individual defendants were successful in their scheming, only that they planned to defraud. And a plan to defraud may be inferred in this instance. "The incentive to complete the lucrative sale of a business, and the personal pecuniary benefits associated therewith, can create a strong motive to engage in fraud and, logically, can raise an inference of scienter sufficient to support allegations of fraud." *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618 (N.D.Tex.1998) (citing *Trecker v. Scag,* 679 F.2d 703 (7th Cir. 1982)). The allegations suffice to support an inference of scienter.

## C. Underwriter Defendants

■ Plaintiffs sufficiently allege that the underwriter defendants acted with scienter.[10] First, plaintiffs allege that Merrill became aware of the problems with USN's automated systems and the corresponding misstatements in the registration statement/prospectus when it was provided with Deloitte's January 1998 report entitled "Summary of Findings and Recommendations," concerning USN's lack of technological infrastructure. This allegation contains sufficient information as to the who, when, what, and how of the alleged fraud. While the complaint does not detail the content of the report, the complaint sufficiently describes Deloitte's consulting role—to assist USN in developing its technological infrastructure and designing a functioning billing system. The subject matter and content of the report, which summarized the facts found during the consulting period, may be inferred from the subject matter of Deloitte's consultation. Merrill contends that plaintiffs do not allege when it received the report, and that if it received the report *after* the public offering, then it cannot have had knowledge of USN's condition at the time

---

**10.** In a single sentence, the underwriter defendants contend that plaintiffs fail to plead any facts suggesting that the other members of the underwriter defendant class aside from Merrill had any knowledge of the state of affairs at USN. However, it is reasonable to infer that as lead underwriter, Merrill communicated its knowledge of USN's operations to the other underwriter defendants.

the registration statement/prospectus was issued. But it is reasonable to infer that a major report prepared by a company's auditor and consultant on the eve of public offering would be quickly provided to, and read by, the firms underwriting that public offering. *See Shahzad v. Meyers,* 1997 WL 47817, at *8 (S.D.N.Y. Feb. 6, 1997) (finding that complaint "alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by the Defendants" because "if the Defendants were the underwriter, market maker, and owner ... the Defendants had knowledge that their representations were false and/or incomplete"). Plaintiffs' allegation that the underwriter defendants also learned the true state of affairs at USN by conducting their due diligence investigation prior to the public offering strengthens this inference.

Second, plaintiffs allege that in March 1998, Merrill demanded the ouster of Elliot, USN's CEO. That Merrill would attempt to exercise authority over USN's highest levels of management also supports an inference that Merrill was sufficiently "in the loop" so as to be aware of the true state of affairs at USN.

■ Third, plaintiffs allege that the underwriter defendants' desire to successfully complete the public offering motivated them to misrepresent USN's condition because (1) Merrill had over $135 million invested in USN, (2) they wished to preserve their credibility, as they had brought in numerous venture capital firms to invest millions in USN, and (3) they wished to maintain their consulting relationship and collect their underwriting fees. While these allegations, standing alone, would not give rise to a strong inference of scienter, they may be considered in light of plaintiffs' allegations concerning Merrill's knowledge of USN's operational difficulties. *See O'Sullivan v. Trident Microsystems, Inc.,* [1993–1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98, 116, at ¶ 98, 914 (N.D.Cal. Jan. 31, 1994) ("Although the [underwriter's] fee standing alone would be insufficient, when combined with allega-

tions of actual knowledge or reckless disregard of the technical difficulties the underwriter defendants either discovered or were reckless in failing to discover, it is sufficient to support an inference of scienter against the underwriter defendants").

**D. Deloitte**

■ To plead recklessness in a securities fraud action against an auditor, the complaint must support an inference that the auditor's conduct was "highly unreasonable ..., involving not merely, simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re First Merchants Acceptance Corp. Securities Litigation,* 1998 WL 781118 (N.D.Ill. Nov.4 1998) (quoting *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992)). The court finds that when taken as whole, plaintiffs' allegations support a strong inference of recklessness by Deloitte.

■ First, plaintiffs contend that Deloitte violated generally accepted accounting standards by failing to gain a sufficient understanding of USN's accounting and control systems and failing to gather sufficient evidence that reported revenue was earned. If Deloitte had done so, it would have realized that USN's internal control and accounting systems were rife with problems and that USN improperly recorded revenue. Plaintiffs also allege that Deloitte violated standard auditing practices by failing to confirm the collectibility of USN's accounts receivable. If Deloitte had done so, it would have discovered that a significant portion of USN's accounts receivable consisted of customers who had not been provided with service. While violations of generally accepted accounting standards and procedures, standing alone, may not support an inference of scienter, "when combined with other circumstances suggesting fraudulent intent, allegations of

improper accounting may support a strong inference of scienter." *First Merchants*, 1998 WL 781118, at *10; *see also In re Digi Int'l, Inc. Securities Litig.*, 6 F.Supp.2d at 1098 (D.Minn.1998) (plaintiffs adequately pled scienter under the PSLRA by alleging accounting violations and "other related omissions of material facts" in public statements regarding the defendant's acquisition of a developmental company); *Rehm*, 954 F.Supp. at 1255–56.

Some of these other circumstances constituting fraudulent intent "can include the presence of 'red flags' or warning signs that the financial reports are fraudulent." *First Merchants*, 1998 WL 781118, at *11. Plaintiffs sufficiently allege the existence of and Deloitte's awareness of these "red flags." In addition to Deloitte's improper auditing, plaintiffs contend that Deloitte had sufficient contact with USN to become aware of the fraudulent abuses and pervasive and fundamental internal control problems at USN—the improper, inaccurate, or non-existent practices concerning USN's recording of revenue, sales, accounts, billing, and provisioning. Plaintiffs support this claim by citing USN's retention of Deloitte as an information technology consultant hired to create a billing system for USN prior to the public offering. According to plaintiffs, for thirteen months prior to the public offering, as many as thirteen Deloitte employees consulted USN on its financial recordkeeping infrastructure and the development of a functional billing system. In the course of this

consultation, Deloitte prepared an extensive report—the "Summary of Findings and Recommendations Report"—detailing USN's lack of technological infrastructure. These are not simply allegations of "access to information." Rather, Deloitte is claimed to have been brought on specifically to evaluate USN's internal accounting and billing controls and to design a system for their improvement. Deloitte's knowledge or reckless disregard of USN's problems may be inferred.

Finally, plaintiffs' claim that USN's lack of internal controls was readily apparent to outsiders such as AT & T and GTE buttresses a strong inference of Deloitte's recklessness; conditions readily discoverable by a third party suggests that an auditor and consultant was likely aware of those conditions. *See First Merchants*, 1998 WL 781118, at *11 (fact that company's chief financial officer "almost immediately discovered the discrepancies in the financial statements" supported Deloitte's recklessness). In totality, plaintiffs allege sufficient facts to support an inference of Deloitte's recklessness.[11]

## III. LOSS CAUSATION

■ Finally, defendants argue that the complaint fails in the entirety because plaintiffs cannot show "loss causation."[12] To state a securities fraud claim, a plaintiff must allege loss causation—"that it was in fact injured by the misstatement or omission of which it complains." *Caremark*,

---

**11.** Deloitte argues that the complaint contains no allegations that it failed to take USN's internal control structures into account in performing its audit, and cites its letter of March 14, 1997 to USN's audit committee in which it noted deficiencies in USN's auditing and accounting practices as demonstrating that it *did* take USN's internal control structure into account when performing its audit. However, simply because the letter acknowledged deficiencies does not mean that Deloitte considered those deficiencies during its audit, and "[t]he specifics of Deloitte's audit are ... precisely the 'the type of facts which are particularly within the defendants' knowledge and therefore, need not be included in the complaint." *First Merchants*, 1998 WL

781118, at *11 n. 5 (quoting *In re Leslie Fay Companies, Inc. Securities Litigation*, 835 F.Supp. 167, 174 (S.D.N.Y.1993)).

**12.** While the Seventh Circuit has held that claims under § 10(b) of the Exchange Act and Rule 10b–5 must adequately plead loss causation, *see Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997), defendants argue that the requirement should also govern claims under § 12(a)(2) of the Securities Act. Because this court finds that plaintiffs have properly plead loss causation, it need not address whether the requirement applies to § 12(a)(2). Plaintiffs meet the requirement in any event.

*Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir.1997); *see also Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (7th Cir.1990) (loss causation occurs where "but for the circumstances that the fraud concealed, the investment would not have lost its value"). The requirement is not a difficult one, and it "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark*, 113 F.3d at 649. Plaintiffs must allege facts supporting an inference that their loss resulted from defendants' misconduct. *See Retsky Family Limited Partnership v. Price Waterhouse LLP*, 1998 WL 774678, at *14 (N.D. Ill. Oct. 21, 1998).

██ In the typical loss causation situation, the plaintiff alleges inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of market reaction to the belated disclosure. *See Retsky*, 1998 WL 774678, at *13. Defendants try to cast plaintiffs' claims in this mold, characterizing plaintiffs' loss as a drop in USN's stock price after the disclosure in November 1998 of certain "true" facts about the dire state at USN. Defendants argue the November 1998 disclosure could not cause the loss because USN's stock prices declined steadily during the class period. According to defendants, the stock price dropped throughout the class period due to the various warnings in the prospectus and the subsequent disclosures during the class period that USN had not generated positive cash flow and that it required additional financing. Defendants contend that it is specious for plaintiffs to argue that the drop resulted from the November 1998 disclosures because those disclosures simply did not reveal any new material information. The

stock price had almost completely bottomed out by that point.

Defendants' argument is unpersuasive. Plaintiffs do not contend that it was disclosure of USN's true financial state in November 1998 that caused the stock price to decline and thereby cause their loss. Rather, plaintiffs allege that their losses resulted from paying an inflated price for USN stock because of the misrepresentations and omissions occurring prior to and throughout the class period. Compl. ¶¶ 237,240,244. As plaintiffs note, simply because the price of USN stock had dropped below $1.00 per share by the time of the November 1998 disclosures does not mean that defendants' misstatements did not cause the loss. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1437 (9th Cir.1987) (explaining that a loss may be caused by a misrepresentation before a corrective disclosure "as a result of market forces operating on the misrepresentations"); *Retsky*, 1998 WL 774678, at *13 (same).[13] To the contrary, it is permissible to infer that had the investing public known of USN's true state of affairs at the outset, USN would not have gone public, at least not at the price of $16.00 per share. According to plaintiffs, the market responded to and "corrected" the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented. Plaintiffs' allegations of an inflated purchase price suffice to meet their burden of pleading loss causation.

### CONCLUSION

The motions to dismiss are granted in part and denied in part. Count II is dismissed as to the individual defendants.

---

13. The individual defendants cite *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir.1997), which rejected the argument that "proof that a plaintiff purchased securities at an artificially inflated price, without more, satisfies the loss causation requirement." *Id.* at 1448. *Robbins* is inapplicable here, as that case dealt with whether the district court should have granted a Rule 50 motion for judgment as a matter of law for insufficient evidence of loss causation.

The motions are denied in all other respects.